**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| CONSUMERS CONCRETE CORP., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 23-cv-2695 |
| | ) | |
| CENTRAL STATES, SOUTHEAST AND | ) | |
| SOUTHWEST AREAS PENSION FUND, | ) | |
| | ) | |
| Defendant. | ) | |

**AMENDED COMPLAINT**

Consumers Concrete Corp. ("Consumers"), for a cause of action against Central States,

Southeast and Southwest Areas Pension Fund ("Fund" or "Defendant"), alleges as follows:

**INTRODUCTION**

1.     Pursuant to 29 U.S.C. § 1401(b)(2), this is an action to vacate and/or modify an

arbitration award related to pension withdrawal liability issued under the Employee Retirement

Income Security Act of 1974 ("ERISA"), as amended by the Multiemployer Pension Plan

Amendments Act of 1980 ("MPPAA").

2.     Many collective bargaining agreements require the employer to contribute to a

multiemployer pension fund.

3.     If an employer ceases having an obligation to contribute to a multiemployer pension

fund, "the employer is liable to the plan in the amount determined under this part to be the

withdrawal liability." 29 U.S.C. § 1381(a).

4.     Withdrawal liability can be either partial or complete, and an employer receives a credit reduction applied against any later withdrawal liability for any prior partial withdrawal liability.

5.     The MPPAA states that "any withdrawal liability of [an] employer for a partial or complete withdrawal … in a subsequent plan year *shall be reduced* by the amount of any partial withdrawal liability … of the employer with respect to the plan for a previous plan year." 29 U.S.C. § 1386(b)(1).

6.     Despite this statutory command, in *Consumers Concrete Corp. and Central States, Southeast and Southwest Areas Pension Fund*, Case No. 01-19-0004-2227 (March 31, 2023) ("the Arbitration"), Arbitrator Norman Brand ("the Arbitrator") allowed the Fund to apply a prior partial credit as an adjustment against unfunded vested benefits before the withdrawal liability has been calculated in accordance with the statute, rather than as a reduction of withdrawal liability after it has been calculated, as the statute requires.

7.     This deprived Consumers of any benefit of the partial credit based on a prior partial withdrawal assessment of more than ten million dollars.

8.     The Arbitrator's decision contradicts the statutory language and definitions of the MPPAA as well as the long-standing opinion letters and promulgated regulations of the Pension Benefit Guaranty Corporation ("PBGC"), the federal agency responsible for interpreting ERISA.

9.     The Arbitrator's decision is erroneous as a matter of law.

10.    Accordingly, pursuant to 29 U.S.C. § 1401(b)(2), Consumers seeks an order vacating and/or modifying the Arbitration award.[1]

---

[1] In the Arbitration, the parties raised, tried and briefed a second issue related to the Fund's calculation and reduction of Consumers' partial credit. However, finding the instant issue dispositive, the Arbitrator did not reach the second issue. Because the Arbitrator's ruling on the first issue is erroneous, his failure to address the second issue is likewise erroneous. In addition, the Arbitrator improperly held that Consumers bore the burden of proof on a legal issue.

2

## PARTIES

11.     Consumers is a Michigan corporation with its principal place of business in Kalamazoo, Michigan.

12.     Consumers is engaged in the business of manufacturing and selling ready-mix concrete and manufactured concrete products throughout Western Michigan and the Midwest.

13.     Consumers is an "employer" within the meaning of 29 U.S.C. § 1451(a)(1).

14.     The Fund's offices are located at 8647 West Higgins Road, Chicago, Illinois.

15.     The Fund is administered at the address listed in paragraph 14.

16.     The Fund is a multi-employer plan within the meaning of 29 U.S.C. § 1002(37) and 29 U.S.C. § 1301(a)(3).

17.     The Fund's trustees administer the plan and are the plan sponsor of the Fund within the meaning of 29 U.S.C. § 1301(a)(10).

18.     The Fund is governed by and in accordance with its Trust Agreement and Pension Plan.

19.     The Trust Agreement and Pension Plan are each a "written instrument" within the meaning of 29 U.S.C. § 1102(a).

20.     The Fund's withdrawal liability rules are set forth in Appendix E to the Pension Plan.

21.     The Fund trustees are fiduciaries within the meaning of 29 U.S.C. § 1104(a)(1).

## JURISDICTION AND VENUE

22.     This Court has jurisdiction over this action pursuant to 29 U.S.C. § 1401(b)(2) and 29 U.S.C. § 1451(c).

23.     Venue is appropriate in this Court under 29 U.S.C. § 1401(b)(2) and 29 U.S.C. § 1451(d) as the Fund's offices are located at 8647 West Higgins Road, Chicago, Illinois, and the Fund is administered at that address, which is in this District.

24.     The Arbitrator's original opinion and award is dated March 31, 2023, and was received by the parties on April 3, 2023.

25.     On April 19, 2023, the Fund moved pursuant to 29 C.F.R. § 4221.9(b)(3) to modify the form of the award to include two additional sentences.

26.     Finding that the requested modification would not change the original award, the Arbitrator signed an amended award on April 22, 2023. The parties received the amended award from the Arbitrator on April 30, 2023, and from the AAA on May 1, 2023. The parties have agreed to treat this amended award as the final award under 29 U.S.C. § 1401(b)(2). (Amended award attached hereto as Exhibit A) (hereafter "Award")

27.     This action is timely filed under 29 U.S.C. § 1401(b)(2) within 30 days after receipt of the Arbitrator's final amended Award.

## BACKGROUND

28.     Consumers was a participating employer in the Fund through collective bargaining agreements with Teamster Locals 7 and 243.

### *The Partial Assessment*

29.     During plan year 2017, Consumers ceased to have an obligation to contribute to the Fund under its CBA with Local 7.

30.     On March 12, 2019, the Fund determined that Consumers effected a partial withdrawal as of December 31, 2017 (the last day of that plan year) and approved a payment schedule of 240 monthly payments in the amount of $42,212.04. ("Partial Withdrawal").

4

31.     The Fund assessed the Partial Withdrawal as a partial withdrawal described in 29 U.S.C. § 1385.

32.     The Fund sent the Partial Withdrawal on March 13, 2019, and Consumers received it on March 14, 2019.

33.     Consumers timely requested review of the Partial Withdrawal on June 5, 2019.

34.     Consumers is current on all monthly payments due under the Partial Withdrawal.

35.     The Fund stipulated that no reduction, waiver and/or abatement of Consumers' liability with respect to the Partial Withdrawal occurred after March 13, 2019, the date it sent the assessment.

36.     The Fund stipulated that it has never changed or altered the Partial Withdrawal in any way since it was issued.

### *The Complete Assessment*

37.     In January 2019 (in plan year 2019), Consumers ceased having an obligation to contribute to the Fund under its collective bargaining agreement with Local 243.

38.     The Fund determined that on January 20, 2019, Consumers effected a complete withdrawal from the Fund within the meaning of 29 U.S.C. § 1383.

39.     On September 18, 2019, the Fund approved an assessment for the complete withdrawal, which was subsequently modified and approved by the Trustees on November 12, 2019. ("Complete Withdrawal")

40.     The parties stipulated that the Fund calculated and assessed the Complete Withdrawal as a complete withdrawal described in 29 U.S.C. § 1383, and not as a partial withdrawal.

41.    The parties stipulated that because it is a complete withdrawal, the partial prorate fraction in 29 U.S.C. § 1386(a) was not applicable to the Complete Withdrawal.

42.    The Fund sent the Complete Withdrawal on September 19, 2019, and Consumers received it on September 20, 2019.

43.    Consumers timely requested review of the Complete Withdrawal on November 22, 2019.

44.    Consumers has made all monthly payments required under the Complete Withdrawal.

<em>The Arbitration</em>

45.    Consumers timely initiated arbitration as to both assessments, which were consolidated for hearing before the Arbitrator.

46.    In the Arbitration, Consumers asserted, *inter alia*, that the Fund erred when it applied the credit as an adjustment to unfunded vested benefits rather than as a reduction of withdrawal liability.

47.    Consumers argued that the statutory definition of "partial withdrawal" limited step two of the calculation of withdrawal liability to partial withdrawals, and that the Fund erroneously applied step two to the Complete Withdrawal, which it stipulated was *not* a partial withdrawal.

48.    Consumers further argued that two PBGC opinion letters were due *Skidmore* deference and a promulgated regulation of the PBGC was entitled to *Chevron* deference.

49.    In the Arbitration, the Fund admitted that the prior partial credit "had no impact on the total amount claimed by the Fund" as a result of the subsequent Complete Withdrawal, and that the amount the Fund demanded Consumers pay for the Complete Withdrawal "was not affected at all" by the Partial Withdrawal.

50.     In his Award, the Arbitrator distinguished "withdrawal liability" from the amount "determined to be the withdrawal liability" for which an employer is liable to the plan, in effect creating two different meanings for the statutory phrase "withdrawal liability."

51.     The Arbitrator held that "while the employer's allocable amount of unfunded vested benefits is its withdrawal liability, that is not the amount for which the employer is liable to the plan. Only the amount determined after the adjustments in section 4201(b)(1) [29 U.S.C. § 1381(b)(1)] is the 'withdrawal liability' for which the employer is liable to the plan."

52.     In his Award, the Arbitrator failed to analyze the statutory definitions of "complete withdrawal" and "partial withdrawal" or the fact that Congress's decision to limit step two of the calculation of withdrawal liability to "the case of a partial withdrawal" limits that step to partial withdrawals within the meaning of that statutorily defined phrase.

53.     Accordingly, the Arbitrator allowed the Fund to apply step two in the case of a *complete withdrawal*, despite Congress's decision to limit that step to *partial withdrawals*. 29 U.S.C. § 1381(b)(1)(B).

54.     In his Award, the Arbitrator asserted without analysis that neither PBGC Opinion Letter 82-35 or PBGC Opinion Letter 85-4 was "convincing," and declined to give those letters *Skidmore* deference.

55.     Moreover, the Arbitrator failed to analyze Consumers' argument that Congress specifically delegated authority to the PBGC to promulgate regulations in this exact area, and those regulations reasonably recognize and respect the fundamental distinction between withdrawal liability and unfunded vested benefits. *See* 29 U.S.C. § 1386(b)(2) and 29 C.F.R. § 4206.3.

56.     The Arbitrator's determinations are conclusions of law and are subject to *de novo* review by this Court.

## COUNT I
## Order to Modify/Vacate the Arbitration Pursuant to 29 U.S.C. § 1401(b)(2)

57.     Consumers repeats and realleges the allegations of paragraphs 1-56 as if set forth herein.

58.     Pursuant to 29 U.S.C. § 1381(a), "If an employer withdraws from a multiemployer plan in a complete withdrawal or a partial withdrawal, then the employer is liable to the plan in the amount determined under this part to be the withdrawal liability."

59.     Pursuant to 29 U.S.C. § 1381(b)(1), "The withdrawal liability of an employer to a plan is the amount determined under section 1391 of this title to be the allocable amount of unfunded vested benefits, adjusted" by four sequential adjustments.

60.     Pursuant to 29 U.S.C. § 1386(b)(1), "any *withdrawal liability* … in a subsequent plan year *shall be reduced* by the amount of any partial withdrawal liability … for a previous plan year."

61.     The Arbitrator erred when he ruled that the prior partial credit is an adjustment to the allocable amount of unfunded vested benefits, rather than a reduction to withdrawal liability.

62.     The Arbitrator erred when he equated the allocable amount of unfunded vested benefits to withdrawal liability, despite Congress's use of two distinct phrases.

63.     The second step in the calculation of withdrawal liability applies only "in the case of a partial withdrawal[.]" 29 U.S.C. § 1381(b)(1)(B).

64.     Under the statute, the term "partial withdrawal" is defined as "a partial withdrawal described in section 1385 of this title." 29 U.S.C. § 1381(b)(3).

65.     Under the statute, the term "complete withdrawal" is defined as "a complete withdrawal described in section 1383 of this title." 29 U.S.C. § 1381(b)(2).

66.     By its terms, the second step applies only to a partial withdrawal, and not to a complete withdrawal. 29 U.S.C. § 1381(b)(1)(B).

67.     Because the Fund stipulated that it calculated and assessed the Complete Withdrawal "as a complete withdrawal described in 29 U.S.C. § 1383, *and not as a partial withdrawal*," the Arbitrator erred in allowing the Fund to apply the credit at the second step, which applies only "in the case of a partial withdrawal[.]" 29 U.S.C. § 1381(b)(1)(B).

68.     In short, even though Congress said step two applies "in the case of a partial withdrawal," the Fund applied it to a calculation it stipulated was *not* a partial withdrawal.

69.     PBGC Opinion Letter 82-35 sets forth the opinion of the PBGC that "in the event of a subsequent withdrawal" a plan sponsor must first calculate the subsequent *withdrawal liability* and "then reduce *that amount* by the amount of partial withdrawal liability previously assessed." PBGC Opinion Letter 82-35.

70.     PBGC Opinion Letter 85-4 declared Consumers' method of applying the credit "correct," and the Fund's method "clearly erroneous." PBGC Opinion Letter 85-4.

71.     PBGC Opinion Letter 85-4 further stated that the prior partial credit "is not an adjustment under Section 1381(b)(1) at all," and set forth its opinion "that the reduction in an employer's withdrawal liability required by Section 1386(b)(1) on account of a previous partial withdrawal assessment *must be made after the employer's subsequent withdrawal liability is calculated* in accordance with Section 1381(b) (without regard to Section 1386(b)(1))." PBGC Opinion Letter 85-4.[2]

---

[2] The cited ERISA sections have been replaced with references to the U.S. Code.

72.    Opinion Letters 82-35 and 85-4 constitute agency interpretations under authority granted by Congress and are entitled to deference under *Chevron, U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984) and later cases.

73.    The opinion letters also constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance under *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944) and later cases.

74.    The Arbitrator erred in refusing to give substantial deference to PBGC Opinion Letters 82-35 and 85-4.

75.    The MPPAA expressly delegated to the PBGC the authority to promulgate regulations related to the calculation of the prior partial credit. 29 U.S.C. § 1386(b)(2).

76.    Pursuant to this delegated authority, the PBGC promulgated regulations through notice and comment rulemaking, including 29 C.F.R. § 4206.3.

77.    29 C.F.R. § 4206.3 states: "Whenever an employer that was assessed withdrawal liability for a partial withdrawal from a plan partially or completely withdraws from that plan in a subsequent plan year, *it shall receive a credit against the new withdrawal liability* in an amount greater than or equal to zero[.]"

78.    Under this regulation, the PBGC reasonably construed the reduction called for by 29 U.S.C. § 1386(b)(1) as a "credit," or a deduction from an amount otherwise due. 29 C.F.R. § 4206.3.

79.    Under this regulation, the PBGC reasonably construed the reduction called for by 29 U.S.C. § 1386(b)(1) to be applied "against" the "new" "withdrawal liability." 29 C.F.R. § 4206.3.

80.    Under *Chevron* and later cases, "the highest deference applies to actions that are the result of express congressional authorizations to engage in the process of rulemaking … that produces regulations … for which deference is claimed." *See, e.g.*, *The Wilderness Society v. U.S. Fish and Wildlife Service*, 316 F.3d 913, 921 (9th Cir. 2003).

81.    The Arbitrator erred in refusing to give *Chevron* deference to 29 C.F.R. § 4206.3.

82.    Indeed, the Arbitrator failed even to address this argument in his analysis, instead confining his ruling solely to the PBGC opinion letters.

83.    The Arbitrator erred when he disregarded the considered views of the PBGC in its opinion letters and promulgated regulations.

WHEREFORE, Consumers requests that the Honorable Court VACATE and/or MODIFY the Arbitrator's ruling in the Award, and that an Order be entered:

A.  Ordering the Fund to apply Consumers' prior partial credit as a reduction against its subsequent complete withdrawal liability, as directed by the MPPAA and the opinion letters and promulgated regulations of the PBGC;

B.  Ordering the Fund to recalculate Consumers' withdrawal liability to reflect the proper credit; or remanding to the Arbitrator the determination of the proper credit;

C.  Ordering the Fund to pay costs and expenses as set forth in 29 U.S.C. § 1451(e); and

D.  Granting such other and further relief as the Court may deem just.

Dated:  May 5, 2023

Respectfully submitted,

/s/ *Mark M. Trapp*
Mark M. Trapp
Conn Maciel Carey LLP
53 W. Jackson Blvd.
Suite 1328
Chicago, Illinois 60604
(312) 809-8122
mtrapp@connmaciel.com

*Counsel for Consumers Concrete Corp.*

11